✓ ___ FILED   ___ ENTERED
___ LOGGED   _____ RECEIVED

9:41 am, Mar 12 2021                                                          Loveland

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**IN THE MATTER OF THE SEARCH OF:**

**CERTAIN ELECTRONIC RECORDS IN**
**THE CUSTODY AND CONTROL OF**
**APPLE AND GOOGLE**

**Case No.**  1:21-mj-552 to -553 TMD

---

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

I, Leah G. Martinez, being duly sworn, do hereby depose and state as follows:

1.      I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), presently assigned to the Human Trafficking Group in Baltimore, Maryland.  I have been so employed with ICE / HSI since September 2009.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  As part of my daily duties as an HSI Special Agent, I investigate criminal violations pertaining to human trafficking, including sex and labor trafficking in violation of Title 18 U.S.C. §§ 1589 and 1591, as well as interstate transportation for prostitution (Mann Act) in violation of Title 18 U.S.C. § 2421.  I have participated, assisted, and led numerous investigations where I have conducted surveillance, executed searches, questioned witnesses and victims, utilized search and arrest warrants, and implemented the use of confidential sources (informants).  I am knowledgeable of the methods used by human trafficking/smuggling traffickers in acquiring and concealing assets with proceeds from these illegal activities.   In addition, I am familiar with the methods utilized by human trafficking/smuggling traffickers ("pimps") who traffic in the exchange of sex for monetary benefits

through recruiting, enticing, importing, smuggling, transporting, harboring, and arranging for the illegal sex trade (prostitution).  Through my training, knowledge and experience, it is known that pimps use various methods to control human trafficking victims, including threats of force and actual force.  As an HSI Special Agent, I am charged with the duty of enforcing the immigration, customs, and other federal statues, such as, but not limited to the Target Offenses described below and other duties imposed by law by the Attorney General of the United States.

2.      The purpose of this application is to search for and seize evidence of violations of Title 18 U.S.C. §§ 1591(a) and 1594(a), Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking Conspiracy; Title 18 U.S.C. § 2422, Coercion and Enticement of an Individual to Travel in Interstate Commerce to Engage in Prostitution; Title 18 U.S.C. § 2421, Transportation of any Individual in Interstate Commerce with the Intent that the Individual Engage in Prostitution or any Sexual Activity for Which the Individual Can Be Charged with a Criminal Offense, and Title 18 U.S.C. § 922(g), Possession of a Firearm or Ammunition by a Convicted Felon ("the Target Offenses").

3.      As a federal agent, your Affiant is authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to affect arrests and execute warrants issued under the authority of the United States.  This affidavit is being submitted in support of a search warrant for records related to the following Google and Apple profiles and accounts. Furthermore, while probable cause to search each of the below-listed accounts is located throughout this affidavit, specific paragraph references related to the identification of each account are included here for the Court's convenience.

- Google Account (Attachment A-1): 4rnbookings@gmail.com (*See* ¶¶ 18 & 23)
- Apple ICloud Account (Attachment A-2): bigsizz202@icloud.com (*See* ¶¶ 17 & 18)

The Gmail account described above will be referred to as the "Target Google Account." The Apple account described above will be referred to as the "Target Apple Account." The Target Google Account and the Target Apple Account will be collectively referred to as the "Target Accounts." Your Affiant has probable cause to believe these records contain fruits, instrumentalities, and evidence of violations of the Target Offenses. The items to be searched are described below with particularity and in the Attachments A-1 through A-2, which are attached hereto and incorporated herein by reference.

4.     I am familiar with the facts and circumstances of this investigation based upon my own work on the case, my review of the available information, and based upon information provided to me from others, to include detectives from the Baltimore City Police Department in Maryland and the Alexandria Police Department in Virginia. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the Target Accounts stated above.

## BACKGROUND OF THE INVESTIGATION

5.     This application arises from an ongoing investigation into sex trafficking violations involving suspect Ryan Odell OLIVER (AKA: "Dre") (Date of Birth: 05/03/82). This investigation has revealed that Ryan OLIVER sex trafficked multiple women by force, fraud, or coercion, and has transported adult women in interstate commerce for the purpose of having those women engage in illegal prostitution.

6.     On November 30, 2018, the Baltimore City Police Department began an

investigation into Ryan OLIVER and the possible sex trafficking of Victim 1.[1]  After being dropped

off at the Greyhound Bus Station in Baltimore, MD, Victim 1 was very upset and asked security to

call 911 to report that she was raped during the second week of November 2018.  Victim 1 was

interviewed that day by a Baltimore City Police Department Police Officer and a Sex Offense Unit

Sergeant, and she provided, in substance, the following information:

- Victim 1 traveled from the Baltimore, MD area from Lexington, KY to meet up
  with her friend, Victim 2.  The two friends previously lived in Lexington, KY.

- Victim 2 came to the Baltimore, MD area in October 2018 and had a "boyfriend"
  named "Dre."  "Dre" was later identified as Ryan Odell OLIVER.

- Upon arrival to Baltimore, MD, Victim 1 was picked up at the bus station by Ryan
  OLIVER and Victim 2, and they went to an apartment in Washington, DC.  They later
  went back to Baltimore, MD to a house at 2701 Liberty Heights Avenue.

- Once at the 2701 Liberty Heights Avenue, Baltimore, MD residence, "Dre" wanted
  to have sex with Victim 1, though she refused.  Victim 2 told Victim 1 that she needed to
  have sex with him, or OLIVER would get very upset and mad.

- Ryan OLIVER (AKA: "Dre") took Victim 1's cell phone and her purse, which
  included other belongings such as her identification, and she felt like she had no choice.
  Ryan OLIVER raped her in Liberty Heights Avenue house.  Victim 1 advised that no other
  threats or violence were used against her.

- "Dre" is a pimp and would take Victim 1 and Victim 2 to hotels and make them
  work as prostitutes.  Victim 2 was working as a prostitute for Ryan OLIVER.

---

[1] To protect privacy, all victim names have been removed from this affidavit and replaced with
identifiers linked to a specific victim.  ("Victim 1", "Victim 2", etc.)  However, unless otherwise
noted, all victims' names and identities are known to law enforcement.

- Ryan OLIVER took Victim 1 and Victim 2 to hotels in Baltimore City, Baltimore County, and unknown areas in Washington, D.C. and Virginia. "Dre" would also arrange for the "clients" or "Johns" to come have sex with the females. Other pimps would also come to the hotels to have sex with Victim 1.

- Victim 1 stated that she had sex with multiple individuals, but she never received any of the money the men paid for it; OLIVER took all the proceeds from the commercial sex acts.

- While at the 2701 Liberty Heights Avenue, Baltimore, MD, residence, Victim 1 was locked inside and was not allowed to leave. The same rules applied to when Ryan OLIVER took her to hotels to work. The door was locked, and she did not have access to the hotel key. She was told that she was not allowed to leave the location.

- OLIVER used multiple vehicles to transport the females to the different hotels. Two of the vehicles, a 2007 Chevrolet Tahoe (NV License Plate: 13544) and an Audi sedan (VA License Plate: UYM7506), were later identified as being registered to Ryan OLIVER at 1010 48th Street NE, Apt 2, Washington, DC 20019. This address was also used as OLIVER's address in the court filings in 2016 for OLIVER's Charles County firearms charges.

- On November 29, 2018, Victim 1 was able to find her cell phone and call her mother. Victim 1's mother threatened OLIVER that she would call the police if he did not release her daughter and let her daughter return home to Lexington, KY. OLIVER later drove Victim 1 to the Greyhound Bus Station in Baltimore, MD, and she asked security to call 911 for her because of what happened to her (on November 30, 2018). Baltimore City

Police Department records and Greyhound subpoena responses corroborate Victim 1's encounter and timeline.

7.      In December 2018, a Baltimore City PD Vice Unit Sergeant discovered that a sex trafficking incident involving Ryan OLIVER as the suspect occurred on December 10, 2018 in Alexandria, Virginia.  On December 10, 2018, an Alexandria Police Department Detective followed up on a report from a potential female victim named Victim 3.  Victim 3 stated that she was held against her will by Ryan OLIVER, assaulted with a phone cord, and given drugs, all while OLIVER managed her in a prostitution ring.  Later that day, the Alexandria PD Detective was able to make a prostitution "date" in an undercover capacity with Victim 3 at 100 S. Reynolds Street, Apt #206, Alexandria, VA.  This operation resulted in the recovery of the victim.  Ryan OLIVER was at the location at the time Victim 3 was recovered, though he fled the scene and was not located.  Two additional female victims, Victim 2 and Victim 4, were also located in the apartment and identified.

8.      All three of the female victims – Victim 2, Victim 3, and Victim 4 – said they were trying to leave, though Ryan OLIVER refused to let them.  The females at the apartment were interviewed and indicated, in substance, that OLIVER obtained the apartment key from an "African man" in Silver Spring, MD who leases various apartments and houses for OLIVER.  The apartment did not have any furniture in it - only personal belongings.  Victim 3's car keys were located in OLIVER's coat.

9.      During the Alexandria PD Detective's interview with Victim 3 in December 2018, Victim 3 identified Ryan OLIVER and stated that he used these nicknames: "Dre," "Foreign," and "Fame."  Victim 3 indicated that Ryan OLIVER was her pimp and had subjected her to physical and sexual abuse such as beating her up, raping her, hitting her with a paddle, and burning her / using her hands as an ashtray.  The following is a summary of the information provided, in

6

substance, by Victim 3:

- Victim 3 knew "Dre" for approximately six years, but only more recently Ryan OLIVER became her pimp and began taking her to hotels and making her work as a prostitute. She was in somewhat of a romantic relationship with OLIVER before he started taking her money. She had to give all her money to OLIVER, and she stated that he would have sex with all of the girls who worked for him. Victim 3 worked for "Dre" in Northern Virginia, Baltimore, and Washington, DC and sometimes stayed at OLIVER's house on Liberty Heights Avenue in Baltimore, MD. They posted the prostitution ads on "Listcrawler.com," "Megapersonals.com" and "Skipthegames.com."

- One of OLIVER's Instagram profiles is "@therealinternationalfame" with "4rners" as his social media logo. His cell phone number was (202) 834-7163. He also used (202) 856-6414 and (786) 540-3281 when he was trying to find Victim 3 after she ran away from him.

- She met Victim 2 and Victim 4 through "Dre." Victim 2 had been with OLIVER for approximately one month and Victim 4 had only been there a couple of days before the encounter with the Alexandria Police Department. Victim 4 was described as only 19 years old and scared, and Victim 3 described Victim 2 as a drug addict. Victim 4 was told to go with Victim 2 to the hotel so Victim 4 could keep an eye on her.

- Since working for Ryan OLIVER, Victim 3 got a "Fame" tattoo and "Foreign" tattoo – two of Ryan OLIVER's nicknames; OLIVER had a "tattoo guy" come to a hotel they were working at on Metro Tech Drive in Chantilly, VA. Victim 2 also got a "Fame" tattoo on her arm. A screenshot of a post of the "Foreign" tattoo on Victim 3's arm was saved from the "@4rners" Instagram page (which is linked to OLIVER's "@therealinternationalfame"

Instagram page).  The comment on the profile is: "Nuff said!!!!! Speaks for itself!!!! #4rn #4rnboss #4rntalk #dcornothing #makemerich #ilovedemhoes #Fame."

• Sometimes the hotel rooms used for the prostitution "dates" were reserved using Victim 3's name and/or Ryan OLIVER's name.

• Victim 3 stated that OLIVER stripped her naked, put her on the floor, and "whipped her ass" when he was angry that she was on the security camera in the VA apartment building.  She knew he had guns, and she was fearful of "Dre" and that he may have other people "fuck with her" too.

• The girls were not allowed to go downstairs in the Baltimore, MD house without permission.  OLIVER liked "dope head girls" to work for him, and he kept drugs such as weed and crack at this house.  OLIVER provided the girls who worked for him drugs, he would promise them nice things, and then he would later try to sober some of them up by giving them Suboxone.

10. During the Detective's interview with Victim 2 in December 2018, Victim 2 identified Ryan OLIVER and said that she knows him as "Dre."  The following is a summary of the information provided, in substance, by Victim 2:

• She had been with "Dre" for approximately four to five months.  She met OLIVER on Megapersonals.  "Dre's" Facebook profile page is "Foreign Kings."  Victim 2's Facebook accounts are "[Victim 2]onlymoneygang" and "[Victim 2] Boss."[2]  Sometimes OLIVER controlled Victim 2's Facebook.

_____

[2] Portions of these account names that included Victim 2's real name have been removed and replaced with [Victim 2] for privacy reasons.

- They used "Megapersonals.com" and "Listcrawler.com" to post the prostitution ads. OLIVER gave her a phone to use for the prostitution ads with the phone number (570) 250-9752. They worked in the Chantilly and Alexandria, VA areas and the Baltimore and Catonsville, MD areas.

- Victim 2 stayed at 2701 Liberty Heights Avenue, Baltimore, MD with OLIVER and some of the other females. She is from the Lexington, KY area and came to Baltimore and began working for "Dre." She also stayed at OLIVER's apartment in the Washington, DC area. He keeps all his drugs at the Baltimore, MD house.

- Victim 2 believed OLIVER was trying to keep her for himself and therefore was not working as much as some of the other girls. She thought that he wanted to have a baby boy with her because he only has daughters.

- Victim 2 has a "Fame" tattoo on her arm for Ryan OLIVER.

- Victim 2 tried to leave OLIVER the other day, and he took her to a location "in the middle of nowhere" and dropped her off. He came back 15 minutes later and picked her up asking "Do you still want to leave?" She remembers "Dre" and Victim 3 both telling her about OLIVER beating Victim 3 with a cord and a paddle. She said that OLIVER is difficult to be around and it only takes little things to set him off. Victim 2 also explained how Victim 3 tried to run off with another pimp, and when OLIVER found her, he made Victim 3 get naked. He tied her up by her feet and beat her with the paddle. Victim 2 believed Victim 3 loved "Dre" and that she knew his "do's and don'ts." OLIVER told Victim 2 that he had guns, but she never saw them.

- OLIVER sold "heroin, powder, crack, weed, all of it." She said that OLIVER got her clean. Note: Victim 2 passed away in March 2019 of a suspected drug overdose in Ohio.

9

11.     On January 7, 2019, Homeland Security Investigations (HSI) Baltimore Special Agent Martinez and Baltimore City PD Vice Unit Sergeant McGrath interviewed Victim 4 at her residence in Lancaster, Pennsylvania.  The following information is a summary, in substance, of the interview:

- Victim 4 met Ryan OLIVER (or "Dre") on Tagged.com.  Ryan OLIVER wanted Victim 4 to visit him in Maryland to hang out and party.  OLIVER told her that he had "weed and money" and that he "does music", is a music producer.  On approximately December 2 or 3, 2018, Victim 4 was picked up by a Lyft car that OLIVER paid for so she could be driven to him in Baltimore, MD.

- After arriving at the Liberty Heights Avenue house, "Dre" wanted to smoke weed with Victim 4, which she had done before, though she felt she was "done" after only a couple puffs from the blunt he rolled.  Ryan OLIVER immediately started to touch her sexually, and she felt uncomfortable right away.  Victim 4 started to cry and told OLIVER that she wanted him to stop, but he did not.  OLIVER continued to force her to have sex with him. OLIVER choked Victim 4 during sex because she wouldn't "open up."  Victim 4 thinks that another drug other than just weed was in the blunt the two smoked that day.  Victim 4 told investigators that she regretted going to Maryland very shortly after meeting Ryan OLIVER.

- Victim 4 met Victim 2 at OLIVER's residence, and "Dre" later got a hotel room for Victim 2 to use for prostitution "dates."  Victim 2 approached Victim 4 after they went to the Howard Johnson hotel and explained to her that she "knew why she was here" and that "you're gonna watch."  Victim 4 believes Victim 2 made approximately $200-300 that time, and OLIVER collected all of the money from her.  Victim 2 told Victim 4 that OLIVER "pops in and out" of the hotels to check on the girls and that she does not keep the money

made from her dates.  The rates were: 30 minutes = \$150; 1 hour = \$200; [Victim 3's] rate for 2 hours was \$300.

- Victim 4 did not want to be in Baltimore with OLIVER, Victim 2, and the other female (Victim 3).  Victim 2 told Victim 4 "don't try to leave; he will find you."  Victim 2 also told Victim 4 that OLIVER had a gun, and she showed her a picture of it.  Victim 2 would post pictures of her and Victim 4 on Facebook even though Victim 4 did not want her to.  Victim 4 described Victim 2 as a dope addict who has a 5-year-old child and was shot in the left leg.

- "Dre" called the other girl Victim 3 "an animal" and made her stay naked once she returned back to the house after leaving him because she broke the rules.  Victim 4 was told that OLIVER "gripped up" the girls, though she never saw him do it.  Victim 2 told Victim 4 that "Dre" said he "beat this bitch (Victim 3) with a wire."

- Victim 4 did not do any prostitution dates, though she believes "Dre" was grooming her to work for him.  Victim 4 remembers Betty, the detective from the Alexandria Police Department, telling her that there was an ad posted for her on the morning of December 10, 2018.  Victim 4 recalled a possible ad for her that indicated "Mandy" was an available girl (prostitute) who had her nipples pierced.

- Victim 3 has a "Foreign" tattoo, and Victim 2 has a "Fame" tattoo – both tattoos were "for Dre."  Ryan OLIVER did not use protection when he had sex with the girls / forced them to have sex.  OLIVER also sold drugs such as weed and heroin.

12.     Some of the prostitution ads for the females working for Ryan OLIVER were posted with the following phone numbers: (571) 250-9752 – Victim 2, (859) 310-0212 – Victim 1, and

(225) 235-0235 – Victim 3.

13.    On January 11, 2019, Ryan OLIVER was arrested pursuant to an arrest warrant from the Baltimore City Police Department.  The Baltimore City Police Department Sex Offense Unit charged Ryan OLIVER with the following offenses: Rape First Degree, Rape Second Degree, Kidnapping, Assault – First Degree, Sex Offense Third Degree, Assault – Second Degree, Sodomy – Generally, Perverted Practice, Reckless Endangerment, and False Imprisonment regarding the victimization of Victim 4.  In the next several months, Ryan OLIVER was charged with similar offenses relating to Victim 1 and Victim 3.

14.    On January 11, 2019, Baltimore City Police Department Vice Detectives seized the following items from Ryan OLIVER's vehicle pursuant to a search warrant: Nintendo Switch game system, a set of keys, credit cards, a face mask, hat, gloves, earphones, and various paperwork documents.  The search warrant for the vehicle was signed by the Honorable Judge Weinstein of the District Court of Maryland for Baltimore City on January 11, 2019.  Also, on the same date, Baltimore City PD Vice Detectives executed a search warrant at Ryan OLIVER's residence at 2701 Liberty Heights Avenue, Baltimore, MD.  HSI Baltimore Special Agents assisted with the execution of the search warrant and the search of the residence.  The following items were seized by the Baltimore City PD: 3 cell phones, 3 SD cards, a thumb drive, a hand-held recorder, an Acer laptop, a plastic bag containing an unknown white powdery substance, various paperwork documents, a ledger, 54 Remington 9mm rounds, and 5 Tulammo 7.62x39mm rounds.   The search warrant for the residence was signed by the Honorable Judge Aldouby of the District Court of Maryland for Baltimore City on January 10, 2019.   The investigation into Oliver has revealed that in 2016 Oliver was convicted of a crime punishable by more than one year in prison, as defined by 18 U.S.C. § 922(g)(1), on or about December 1, 2016.

12

15.     On July 18, 2019, Baltimore City Police Department Vice Sergeant McGrath and HSI Special Agent Martinez met with Victim 1 in Lexington, KY.  The following is a summary of the information discussed with Victim 1, much of which was covered in Victim 1's interview in November 2018:

- Victim 1 met Ryan OLIVER through her friend Victim 2.  Victim 1 and Victim 2 both lived in the Lexington, KY area.  She met Victim 2 approximately one year ago, and they were both drug addicts at the time.  Victim 2 later got "clean," and she met Ryan OLIVER, or "Dre."  Victim 1 remembers talking with Victim 2 over a Facetime phone call when Victim 2 was in Baltimore, MD with Ryan OLIVER, Victim 2's so-called "boyfriend."  Victim 2 wanted Victim 1 to come up to Baltimore and told her she could stay in the other bedroom in OLIVER's house.  Victim 1 was under the impression that she may be able to bring her son to Maryland if the set-up worked out.

- "Dre," bought Victim 1 a bus ticket on a Greyhound bus to travel from Kentucky to Baltimore on November 9 or 10, 2018.  "Dre" had a house on Liberty Heights Avenue in Baltimore and an apartment in Washington, DC.  The bedroom closest to the bathroom was where Victim 2 stayed with "Dre," and the other small bedroom upstairs was next to that room.  "Dre" would lock the bedroom doors from the outside, and he was the only one who had the key to unlock it.

- It became clear to Victim 1 that "Dre" was a pimp and "the only boss."  Victim 1 saw an older female do "jobs," or prostitution "dates."  "Dre" posted the prostitution ads from his cell phone.  OLIVER normally rented two hotel rooms – one for the girls to work in and one room for himself.  He always kept all of the money from the "dates," and the girls would have to ask to have money for food, etc.  The prices for the "dates" were

13

approximately $100 to $200.  Anal sex, oral sex, and other "extras" were additional prices. "Dre" made the prostitution ads, and sometimes a female known to Victim 1 by a shortened version of Victim 3's name took the photos for the ads.

• On the third night that Victim 1 was in Baltimore, Victim 2 gave OLIVER oral sex in front of Victim 1 in the bedroom where they were staying.  Victim 1 tried to act like she was sleeping, but OLIVER started touching her sexually.  She felt uncomfortable and did not want to have sex with him.  She told OLIVER she did not want to, but he did not stop touching her.

• One time, Victim 3, known to Victim 1 by a shortened version of Victim 3's first name, ran away while Victim 1 was staying at OLIVER's Liberty Heights Avenue house. When Victim 3 returned to the house, OLIVER took Victim 3 into the other bedroom and yelled at her.  Victim 2 and Victim 1 could hear what was going on because they were in the bedroom next to Victim 3's room, and the walls were thin.  OLIVER tied Victim 3 by her hands and feet, and he forced her to do anal sex with him.  OLIVER also forced her to have vaginal and oral sex with him.  OLIVER hit her with a paddle, and she was screaming in pain.  Victim 1 and Victim 2 tried comforting Victim 3 after OLIVER left the bedroom.

• Ryan OLIVER put his hands on Victim 1's shoulders and pushed her while at the Baltimore house.  He has also "gripped her up" by forcefully grabbing her wrists when he got angry.  OLIVER would take Victim 1's cell phone at times or would stand over her to monitor what she was doing on her phone.

• OLIVER paid for the hotel rooms with prepaid cards and sometimes the rooms were under his name or the other females' names.

- "Dre" smoked weed and sometimes took Adderall pills. Ryan OLIVER supplied everything to the girls from Adderall pills to cocaine, crack, weed, and heroine. Victim 1 had smoked crack before; she was into "uppers" when she used drugs. "Dre" got her addicted to heroin, which is a drug she would never choose. "Dre" stuffed heroin in Victim 1's cigarettes when she was either sleeping or when she was in the shower. She ended up becoming addicted to heroin because of him. Victim 1 was burned by a crack pipe because Ryan OLIVER would purposely do something to make her drop the pipe. She still has burn marks on her chest.

- Victim 1 was in Washington, DC and Maryland with OLIVER. She believes they may have been in Arlington, VA as well. Victim 1 believed other girls went to Pennsylvania and New Jersey for OLIVER.

- OLIVER's rapper name was "Fame." Victim 1 recalls that he had a Facebook account that she later ended up blocking. She was unsure of an Instagram account for OLIVER.

16.    On October 22, 2019, Ryan OLIVER entered into an *Alford* Plea and was convicted of Rape Second Degree of Victim 4 and Victim 1. Due to the agreement of the *Alford* Plea, the remaining Sex Offense, Assault, and Reckless Endangerment counts are considered "Closed – Jeopardy or Other Conviction." All three of the sexual assault / rape cases from 2018 (Victims: Victim 1, Victim 4, and Victim 3) were concluded with OLIVER's Alford Plea. OLIVER was sentenced to twenty years incarceration with twelve years suspended in the case involving Victim 4. OLIVER was sentenced to fifteen years incarceration with fourteen years, seven months, and two days suspended for the case involving Victim 1. Additionally, on December 2, 2020, Ryan Oliver was indicted by a federal grand jury on ten counts sex trafficking conspiracy, interstate

15

prostitution conspiracy, three counts of sex trafficking, interstate transportation, enticement, and possession of ammunition by a convicted felon.

17.     According to the partial cell phone forensics extraction and analysis of the iPhone XR cell phone seized from Ryan OLIVER on the day of his arrest on January 11, 2019, the following email account is the Apple ID email address recovered and associated to this phone: "getmoneyissue@gmail.com." "Getmoneyissue@gmail.com" is also reported as the iCloud account under Account Description.  The phone number assigned to this iPhone is (202) 834-7163, as well as (202) 341-4127, and the "Owner Name" is "FAME."  A "User Account" on the phone indicates "4rners@gmail.com" as a Gmail account also associated to this phone.  The two other Gmail accounts under "User Accounts" on the iPhone are: "getmoneyissue@gmail.com" and "ro.oliver8817@gmail.com."     A    "User     Account"    on    the    phone    also    specifies "bigsizz202@icloud.com" as the "CloudKit" under the Account Description.  This is the only icloud.com account associated to this phone.  Photos of the following identified victims and witnesses in this investigation were viewed in the "Images" section on Ryan OLIVER's iPhone: Victim 3, Victim 2, Victim 1, and four other victims/witnesses relevant to the investigation.  The search warrant for OLIVER's iPhone was signed by the Honorable Judge Boles of the District Court of Maryland for Baltimore City on February 11, 2019.

18.     In November 2019, the Honorable J. Mark. Coulson, United States Magistrate Judge authorized a series of search warrants for various electronic accounts, including: two Facebook accounts    ("Foreign    Kings"    and    "Gmi    Recordss");    two    Instagram    accounts ("@TheRealInternationalFame" and "@4rners"); three Gmail accounts ("4rners@gmail.com", "getmoneyissue@gmail.com", and "ro.oliver8817@gmail.com"); and the Apple iCloud account that is the Target Apple Account for this affidavit: bigsizz202@icloud.com account.  The results from the search warrant for the Target Apple Account were not properly downloaded and saved,

therefore, your Affiant is seeking a new search warrant for the Target Apple Account.  The Target Google Account "4rnbookings@gmail.com" was discovered after receiving the Uber subpoena response as described below.

19.     The Facebook search warrant mentioned above for the Username: "GMI Recordss" / User ID: 1085479026 account produced the following response for the registered email accounts: "getmoneyissue@gmail.com" and "dcownfame@facebook.com."   The registration date for this account is December 30, 2008.  The Facebook search warrant response displayed a search for "[Victim 2's name with a typo]" on October 27, 2018.  The "GMI Recordss" account is friends with "[Victim 2] onlymoneygang" (User ID: 100030217940971).  That Facebook account was identified as belonging to Victim 2 from the Lexington, KY area.  A message thread from the Facebook return displays Facebook Username "[Victim 2] Boss" (User ID: 100025114052154) as a participant on December 14, 2019; this is another Facebook account associated to Victim 2.

20.     The Facebook search warrant results for the Username: "Foreign Kings" (User ID: 100010846178970) reported the following two registered email addresses: "4rners@gmail.com" and "100010846178970@facebook.com."   The registration date for this account is December 11, 2015.  Under "Phone Number," this account reports 1 202 341 4127 as the phone number used for verification.  This phone number (202) 341-4127 is assigned to the Apple iPhone XR cell phone that was seized from Ryan OLIVER by the Baltimore City Police Department on January 11, 2019.  Facebook Username "[Victim 2] onlymoneygang" (User ID: 100030217940971) is reported as a friend of the "Foreign Kings" account.  The "Foreign Kings" account became friends with that account on November 27, 2018.  Facebook Username "[Victim 2] Boss" has pages of messages with Ryan OLIVER's "Foreign Kings" account from approximately November 9, 2018 to December 22, 2018.  These messages discuss making money, Victim 1, Victim 3, the relationship

between Victim 2 and Ryan OLIVER, and other details such as getting Chinese food delivered to the house. One message from Username "[Victim 2] Boss" to "Foreign Kings" on November 16, 2018 reads: "Wym daddy what have I did wrong" and "I am focused daddy just wanted to be awake cuz i was tired of sweeping daddy i am so sorry wont ever ask for nomore ill be sober to the fullest for the both of us and i know its for the best." The following message from Username "[Victim 2] Boss" to "Foreign Kings" on November 17, 2018 reads: "That what you talking about daddy is me keep wanting to be woke?? Im just tired of sleep and ready to get to the trap and us get you all way together daddy i love being in the trap i love getting you together babydaddy." On December 12, 2018, Username "[Victim 2] Boss" tells "Foreign Kings," "You need to stay away from (Victim 4) she told detectives you raped her and she gave your address and (Victim 3) got them to take pics of some Mark's on her saying u did it and I know u didn't they some scandalous hoes but I heard you've been reaching out and blowing (Victim 4) up but YET still ain't tried to contact me." On December 10, 2018, Victim 2, Victim 3, and Victim 4 were encountered by the Alexandria Police Department as described above beginning in Paragraph 7. Several conversations and details from Ryan OLIVER's Facebook account messages relate to the victims identified in this affidavit and their related activity and relationships.

21. The Instagram search warrant results for Instagram Username: "Dcownfame" / User ID: 215944904 account reported "getmoneyissue@gmail.com" as the registered email address. The Vanity Name associated with this account is "@therealinternationalfame." The registration date for this Instagram account is August 31, 2012. The "Dcownfame" / "@therealinternationalfame" Instagram account is friends with "@neveahstacks" / User ID: 9166856508, which has been identified as Victim 2's Instagram account. On April 18, 2018, Instagram Username "Dcownfame" posted this: "Told me I had altered mags told me I increased the €rime rate said I was a menace!!!!

18

Then they let me out !!!!! Then I ran that Sak right bak up AND GOT MORE #gmitilidie #realred #4rn #4rngang30dntaim #wontmiss50shots @ Southeast, Washington, D.C."  This post included two photos of hundreds of bullets in an outside drain.  These photos and comments are also posted on Ryan OLIVER's "Foreign Kings" Facebook account.

22.     The Instagram search warrant response for Ryan OLIVER's other Instagram account with Username: "Foreign Affairs" / User ID: 2328190232 reported "4rners@gmail.com" as the registered email address.  The Vanity Name associated with this account is "@4rners."  The registration date for this Instagram account is December 15, 2015.  This account was verified with phone number 1 202 320 4597.  Instagram Username "Foreign Affairs" / "@4rners" has several messages with Username "@spoiledjewishprincess" / User ID: 1146050994, which has been identified as Victim 3's Instagram account.  On October 7, 2018, "@spoiledjewishprincess" sends media that states "I can't be controlled. So all I want is someone who can watch me do my thing and say 'that's my baby'."  She continues by writing him, "I let you run shit, I just be thinking I have control." The "Foreign Affairs" / "@4rners" Instagram profile also has several messages referencing the "whole pimpin thing," escorting, "hoes," "selling pussy," making money, hotels, and his relationships with numerous females.

23.     In February 2020, subpoena results were received from Uber Technologies regarding a request for records relating to all subscriber and rider trip information for Ryan OLIVER, (202) 834-7163, and 4rners@gmail.com.  The records revealed the following for Ryan OLIVER's Uber account that was suspected of being used to facilitate the transportation of the female trafficking victims:

Rider information as specified in your request:

Name: Andre King

Phone number: 202-834-7163

Email address: 4rnbookings@gmail.com

Name: Ryan Odell

Phone number: 202-856-6414

Email: 4rners@gmail.com

The information received from the Uber subpoena confirms that (202) 834-7163 is the phone number used by and associated to Ryan OLIVER's Uber account.  This is also the phone number assigned to the iPhone XR seized from Ryan OLIVER on the day of his arrest as mentioned above. The (202) 856-6414 phone number was also a known phone number of OLIVER's according to Victim 3.  The Uber account information received connects the 4rners@gmail.com account to Ryan OLIVER, and another similar email account "4rnbookings@gmail.com" was also provided.  The trip details included in Uber's subpoena response report numerous trips in and around the Baltimore, MD, Washington, DC, and Alexandria, VA areas between October 2018 and January 2019.  One trip indicates the request for a ride from near Victim 4's residence in Lancaster, PA on December 5, 2018.  Several of the Uber trips were to and from hotels, which indicates frequent hotel stays or visits that your Affiant knows is a common activity in trafficking cases.  Two of the trips reported a pickup and drop-off in the close vicinity of Ryan OLIVER's 2701 Liberty Heights Avenue, Baltimore, MD residence.  Ryan OLIVER's middle name is "Odell," which corresponds with the Uber Rider Name "Ryan Odell."  Uber Rider Name "Andre King" is consistent with "Dre," which is what several of the victims reported calling Ryan OLIVER.  "King" appears to represent Ryan OLIVER's persona with the "Foreign Kings" rap group.

24.     Based on your Affiant's training and experience and participation in other

20

investigations, your Affiant knows the following – perpetrators of crimes, such as sex trafficking and the interstate transportation of an individual for the purpose of prostitution, often e-mail, text, or instant message others in the hours building up to the crimes to inaudibly plan their course of action and to further their illegal "business" ventures.  Perpetrators of these crimes often take pictures and/or make a video recording of them committing such crimes using their cell phone.  The perpetrators of such crimes often display the pictures or videos from these crimes and their personal networks, or post their "work," on social networking websites such as Facebook, Twitter, YouTube, Kik, WhatsApp, Snapchat, and Instagram, etc.  The perpetrators do so to show off what they've done, to recruit other individuals, to expand their illegal businesses, and to receive attention from possible admirers.  Perpetrators of these crimes will also have their victims get tattoos relating to the perpetrator to "brand" those who work for them and to show the "ownership" they have over the victims.  Accordingly, in my training and experience, evidence recovered from electronic accounts such as Google and Apple is often valuable to human trafficking investigations.

25.     As described above, Ryan OLIVER has met women and has recruited females to work for him as prostitutes on various social media platforms.  As mentioned above, OLIVER met Victim 2 on Megapersonals.com and met Victim 4 online on Tagged.com; he later prostituted both of these females.  Ryan OLIVER's associated Facebook and Instagram Accounts include images of Ryan OLIVER and connect his social media accounts to one of his Google Gmail accounts.  The Target Apple Account may contain a backup of OLIVER's iPhone which could include the storage of his electronic files such as photos, iMessages, and emails.  Therefore, based on training, knowledge, experience and the investigation to date, your Affiant believes that the Target Accounts mentioned above contain information relevant to this investigation, such as instant messages, e-mails, iMessages, social media posts, contact / "Friends" lists, pictures, ads, audio files, and videos.

The retrieval of data from the Target Accounts will support information and/or evidence obtained during the course of this investigation.

## BACKGROUND ON GOOGLE AND GMAIL

26.     Google provides numerous free services to the users with a Google account. Some of services include, Gmail, YouTube, Voice, Blogger, Google+, Android, Photos, Drive, Location History, and Search and Browsing History. Gmail is a web-based email service. YouTube is a free video sharing website that allows users upload, view and share videos. Voice is Google's calling, voicemail transcription, and text messaging service. Blogger is Google's free weblog publishing tool for sharing text, photos, and video. Google+ is a forum to share photos, videos, and other information with other users. Android is Google's open source operating system used for mobile devices. Photos stores images for a broad range of Google products. Drive is Google's online storage service for a wide range of file types.  Google e-mail, a free web-based e-mail, maintains records pertaining to the individuals or companies for which they maintain accounts.  These records include: account access information, e-mail transaction information, account application information, and other information, both in computer data format, which records the activities and interactions of these accounts.  Any e-mail that is sent to a Google e-mail customer is stored in the customer's "mailbox" on a Google server/computer until the subscriber connects to the Internet through their mobile device or any web-connected computer and signs onto their Google e-mail account and retrieves their messages.  When the customer sends an e-mail, it is initiated at the user's computer or mobile device, transferred via modem to Google system, and then transmitted to its end destination.

27.     A Google e-mail customer can store files, including e-mails and image files, in the server/computer maintained by Google, in his/her account or any other account to which he/she has access.  E-mails and image files stored in the Google server/computer by a customer will not necessarily be located in the customer's home computer.  The customer may store e-mails and image files in the server/computer at Google or other files for which there is insufficient storage space in the customer's computer or which he/she does not wish to maintain in the computer in his/her residence.  A search of the files in the computer in the customer's residence will not necessarily uncover the files that the customer has stored in Google's servers/computers.

### BACKGROUND ON APPLE AND ICLOUD

28.     I know that Apple is an American multinational corporation that designs, develops, and sells consumer electronics, computer software and personal computers.

29.     I also know that Apple offers services called "iCloud" and "iMessage" to its users.

30.     iCloud is a service provided by Apple that allows its users to store files on Apple's servers in order to sync their files across all of their Apple devices, including iPhones such as the iPhone XR device associated with Ryan OLIVER and linked to the iCloud account that is one of the "Target Accounts" of this affidavit.  I know from my training and experience that iCloud accounts often contain "backups" for associated devices, such as Apple iPhones.

31.     Anyone using an iPhone, must set up an Apple ID, using a valid electronic mail address.  An iPhone typically has a cellular telephone number associated with it, as well as cellular telephone service provided by a third-party cellular company.

32.     Messaging, the transmission of information from one electronic device to another, comes in many variations.  I know, based on training and experience, that individuals involved in

collective criminal activity use Apple devices to send messages to each other, including iMessages, which are discussed in further detail below.

33.     Traditional text messaging, formally known as the Short Message Service ("SMS"), is text-only service provided by a mobile telephone service provider.  This service is normally provided over the cellular network, from one device to another, based on mobile telephone number. SMS has been augmented with the Multimedia Messaging Service ("MMS") which expands the capabilities with group messaging and expanded message formats.  Group messaging allows individuals to communicate with multiple people simultaneously, while expanded message formats allow users to transmit pictures, videos and/or audio recordings.  Further, based on the typically larger sizes of these messages, MMS is normally delivered over a user's mobile data connection rather than the mobile telephone, or circuit, connection.  Mobile telephone service providers typically maintain transactional records regarding SMS and MMS communications, including the sender, recipient, and date/time of the message.

34.     Apple has further evolved messaging with iMessage.  Using the Messages application on any Apple device that uses Apple iOS or Mac OS X, a user can send an iMessage to any other iOS or Mac OS X device.  Further, iMessages sent from one Apple device can appear on all other Apple devices that are associated with the same Apple ID, and have activated the Messages application on that device.  An iMessage is sent and received based on an Apple ID, but can also be sent based on the user's telephone number, if a telephone number is associated with that device.  If an iMessage is sent, the message uses an Internet data connection, whether that connection is provided by the mobile telephone service provider or a Wi-Fi hotspot.  Apple encrypts iMessages. I am aware that iMessages is the default messaging application for iPhones, unless the user affirmatively disables the iMessages application.

35.     If a data connection is not available to the Apple device, or the Apple device is sending a message to a non-Apple device, the Messages application will default to traditional SMS if possible, for delivery of the message.  Further, iOS allows a user of Apple devices to disable iMessage on one or more of a user's Apple devices, so that the user will not receive iMessages on a given device.  Transactional records pertaining to iMessages sent and received are not captured through the mobile telephone service provider.  However, Apple does capture transactional records regarding iMessages.

36.     Based on my training and experience, I have learned that iPhones often have associated "Cloud" (Backup) accounts on which there is data and information stored by the user of the iPhone.  Moreover, based on my training and experience, I know that instant messages, emails, voicemails, photos, and videos—all of which may be saved on a user's iCloud account—are often created and used in furtherance of collective criminal activities, including sex trafficking and Mann Act offenses.

## CONCLUSION

37.     Based upon the information outlined above, there is probable cause to believe that within the above described Google and Apple accounts there is evidence of violations of the Target Offenses.  By this affidavit and application, your Affiant requests that the Court issue search warrants directed to Google and Apple requiring them to disclose to the Government the information related to the accounts/items described in Attachments A-1 and A-2 thereafter authorizing the Government to search for and seize the information described in Attachments B-1 and B-2.

38.     Because the requested warrants seek only permission to seize and search electronic data and information, the execution of the requested warrants do not involve the physical intrusion

onto a premise.  Consequently, I submit that there is reasonable cause for the Court to authorize execution of the requested warrant at any time in the day or night.

Respectfully Submitted,

*Leah Martinez*

LEAH G. MARTINEZ
Special Agent
Homeland Security Investigations
Department of Homeland Security

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on the _____26_____ day of _____Feb_____, 2021

Honorable Thomas M. DiGirolamo
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A-1</u>

### ITEMS TO BE SEIZED AND SEARCHED

This warrant applies to information associated with the following Google account:

4rnbookings@gmail.com

that is stored by Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## <u>ATTACHMENT A-2</u>

### ITEMS TO BE SEIZED AND SEARCHED

This warrant applies to information associated with the following Apple iCloud account:

The Apple iCloud account associated with the email address

bigsizz202@icloud.com

The requested Apple iCloud information and records are stored at premises owned, maintained, controlled, or operated by Apple, Inc., a business headquartered at 1 Infinite Loop Cupertino, CA 95014.

## ATTACHMENT B-1

### PARTICULAR THINGS TO BE SEIZED

I.          **Information, Files, and Accounts to be produced by Google, LLC between January 1, 2016 and the Present.**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, LLC including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to Google or have been preserved pursuant to a preservation request under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

**A.  Google Account Information**

a.  Google account registration information, including name, user-specified contact information, recovery email address, recovery SMS number, account creation timestamp and IP address, and a list of Google services the account holder has enabled or accessed;

b.  Account change history IP addresses and associated timestamps;

c.  Google account login and logout IP addresses and associated timestamps;

d.  All means and sources of payment for all Google products and services (including complete credit or bank account numbers), and detailed billing records;

e.  All cookie and user-specific advertising data, including third-party cookies;

**B.  Gmail Account Information**

a.  Gmail specific subscriber information, login and logout IP addresses and associated timestamps;

b.  Gmail specific non-content email header information, originating message IP addresses, and account settings;

c.  The contents of all e-mails, attachments and chat messages stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

d.  Contents of all available deleted emails;

**C.  <u>YouTube Account Information</u>**

a.  YouTube specific subscriber information, including date of birth and country;

b.  YouTube specific login and logout IP addresses and associated timestamps;

c.  YouTube video upload IP addresses and associated timestamps;

d.  Copies of all publically available videos;

e.  Copies of all private videos and associated video information;

f.  Copies of all private messages;

g.  All Channel or Video comments;

h.  All contacts;

**D.  <u>Google Voice Account Information</u>**

a.  Voice specific subscriber information, including signup IP and associated timestamp and user-provided name;

b.  Call and text logs;

c.  All account settings and account change history;

d.  Contents of all voicemail messages and text messages;

**E.  <u>Blogger Account Information</u>**

2

a. Blogger specific subscriber information, including Blog registration information, Blog creation IP and timestamp, Blog owner/admin subscriber information, and post or comment owner information;

b. All contents of private blog posts and comments;

**F.  <u>Google+ Account Information</u>**

a. Google+ specific subscriber and IP address information, including associated timestamps;

b. All IP addresses and timestamps associated with Posts, Comments, or Photos;

c. All Content/Activity Stream, including posts, comments, and photos;

d. All contacts/Circles;

e. Google+ Profiles;

**G.  <u>Android Account Information</u>**

a. Android specific subscriber and IP address information, including associated timestamps;

b. All device IDs, IMEIs, and MEIDs associated with the target account(s);

c. Timestamps, including device registration, first check-in, and last check-in;

d. All Google accounts tied to the Android device(s) if any;

e. Android hardware information;

f. Cell carrier/service provider;

g. All apps downloaded to the device;

**H.  <u>Photos Account Information</u>**

a. Photos specific subscriber and IP address information, including associated timestamps;

b. All upload IP addresses and associated timestamps;

c. Contents of all Photos and Albums, including all exif data included by the user as part of the upload;

3

**I.** **<u>Drive Account Information</u>**

a. Drive specific subscriber and IP address information, including associated timestamps;

b. All upload IP addresses and associated timestamps;

c. All Drive content, including Docs, Sheets and Slides;

**J.** **<u>Google Location and Search History Information</u>**

a. All location history with associated timestamps.

b. All search history and associated timestamps, including all "clicks" and "queries;"

**K.** **<u>Waze Location and Search History Information</u>**

a. Waze specific subscriber information, login and logout IP addresses and associated timestamps;

b. Waze specific non-content information, including account settings;

c. All location history with associated timestamps.

d. All Waze search history and associated timestamps, including all "clicks" and "queries;"

e. All Waze locations saved by the user;

**II.** **Information to be Seized by Law Enforcement Personnel**

All information described above in Section I that constitutes fruits, evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §§ 1591(a) and 1594(a), Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking Conspiracy; Title 18 U.S.C. § 2422, Coercion and Enticement of an Individual to Travel in Interstate Commerce to Engage in Prostitution; Title 18 U.S.C. § 2421, Transportation of any Individual in Interstate Commerce with the Intent that the Individual Engage in Prostitution or any Sexual Activity for Which the Individual Can Be Charged

4

with a Criminal Offense, and Title 18 U.S.C. § 922(g), Possession of a Firearm or Ammunition by a Convicted Felon ("the Target Offenses")   :

a. All images, messages, communications, videos, calendar entries, contacts, and other media, including any and all preparatory steps taken in furtherance of these crimes;

b. Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

c. Evidence of the times the account was used;

d. All images, messages, videos, and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

e. Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

f. Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

g. All existing printouts from original storage which concern the categories identified in this subsection;

h. All location data relevant to the investigation of the above-listed times;

i. All "address books" or other lists of contacts.


**III.     The government's search**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS**

<u>**RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) AND 902(13)**</u>

I, _____, attest, under penalties of perjury under the laws of

the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this

declaration is true and correct.  I am employed by _____. (hereinafter "the

business"), and my official title is _____.  I am a custodian of

records for the business.  I state that each of the records attached hereto is the original record or a

true duplicate of the original record in the custody of the business, and that I am the custodian of

the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of the business; and

c.      such records were made by the business as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) and 902(13) of the Federal

Rules of Evidence.


_____          _____
 Date                                                      Signature

1

## ATTACHMENT B-2

### Apple, Inc.

### Particular Things to be Seized

**I.   Files and Accounts to be produced by Apple Inc. from January 1, 2016, to the present.**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Apple (the "Target ISP"), the Target ISP is required to disclose the following information to the government for the accounts or identifiers listed in Attachment A-2 (the "Target Account").

a.      All iCloud data existing on Apple's servers, including subscriber information, mail logs, and all iCloud content, including, but not limited to, email, photo stream, photo library, documents, contacts, calendars, bookmarks, and Safari browsing history;

b.      All iOS device activation information and device backups, including photos and videos in the Camera Roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail;

c.      All FaceTime records, including call invitation logs;

d.      All iMessage records, including capability query logs;

e.      All Find My iPhone records and transactional activity, including records of all attempts to locate, lock, or wipe the device;

f.      All My Apple ID, iForgot, and Game Center connection logs and transactional records;

g.      All device registration or customer information associated with the account, including name, address, email address, and telephone number;

h.      All customer service records, including support interactions, warranty and repair information;

1

i.      All iTunes data, including basic subscriber information, purchase information, and iTunes Match data;

j.      All Apple retail store, online store, and gift card information associated with the account;

k.      Subscriber Information, including the name and location, supplied by the user at the time of registration, the date the account was created and all of the services of the Target ISP used by the Target Account;

l.      Records of user activity for each connection made to or from the Target Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses, and any telephone, instrument or other unique identifiers collected by the Target ISP and associated with the Target Account;

m.      All telephone or instrument numbers associated with the Target Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI")).

## II.     Information to be Seized by Law Enforcement Personnel

All information described above in Section I that constitutes fruits, evidence, fruits, and instrumentalities of violations o f Title 18 U.S.C. §§ 1591(a) and 1594(a), Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking Conspiracy; Title 18 U.S.C. § 2422, Coercion and Enticement of an Individual to Travel in Interstate Commerce to Engage in Prostitution; Title 18 U.S.C. § 2421, Transportation of any Individual in Interstate Commerce with the Intent that the Individual Engage in Prostitution or any Sexual Activity for Which the Individual Can Be Charged with a Criminal Offense, and Title 18 U.S.C. § 922(g), Possession of a Firearm or Ammunition by a Convicted Felon ("the Target Offenses"):

a.      Records, documents, programs, applications, photographs, video or audio recordings, call history information, text messages and other cellular phone communications, social media postings, stored phones numbers or address book contacts, voice mail messages or voice mails stored in any form, and other digital evidence, that refer or relate to:

i.      Firearms or items that appear to be firearms and weapons or items that appear to be weapons;

ii.     RYAN OLIVER and all associates of RYAN OLIVER;

iii.    Evidence of clothing worn during the commission of the offenses;

iv.     Photographs of any items or object used during the commission of the offenses, including vehicles, bags, etc.;

v.      Evidence or photographs, videos, or other media related to the advertisement or prostitution of women or girls and the Target Offenses;

vi.     Finances, bank accounts, financial records, or records of financial transactions;

vi.     Messages between RYAN OLIVER and any associates;

vii.    Social media or electronic account information as it pertains to the Target Offenses;

viii.   Renting of rooms at hotels or the receipts related to renting of rooms at hotels;

ix.     Places of domicile, and places where RYAN OLIVER and associates may have resided, temporarily or otherwise; and

x.      Illicit drugs or controlled dangerous substances, including the use, possession, purchase, or sale thereof.

b.      All phone books that contain and identify contacts of RYAN OLIVER;

c.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s), owner or possessor of the Target Account.

d.      All location data, including any GPS coordinates or any applications that would store such information.

e.      Evidence of who used, owned, or controlled the Target Account listed on Attachment A-2.

g.      Evidence of the times the Target Account listed on Attachment A-2 was used.

h.      Passwords and encryption keys, and other access information that may be necessary to access the Target Account listed on Attachment A-2 and other associated accounts.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

## III.     The government's search

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from

substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS

## <u>RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by _____. (hereinafter "the business"), and my official title is _____.  I am a custodian of records for the business.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of the business, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of the business; and

c.      such records were made by the business as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____

Date                                                    Signature

1